[Civ. No. 14740. Fourth Dist., Div. One. May 4, 1976.]

RICHARD O. CARLSON et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Sankary & Sankary, Morris Sankary, Mathews, Bergen, Vodicka & Montag and Wesley H. Mathews for Petitioners.

No appearance for Respondent.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman, Robert J. O'Neill and Henry R. Mann, Deputy District Attorneys, for Real Party in Interest.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, and Jay M. Bloom, Deputy Attorney General, as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**AULT, J.**—Richard O. Carlson and Neill V. Barton are charged with two counts of grand theft (Pen. Code, § 487.1) and one count of conspiracy to cheat and defraud (Pen. Code, § 182, subd. 4). They have petitioned this court for a writ of prohibition or mandate under Penal Code section 1538.5, subdivision (i), after denial of their motion to suppress evidence seized in the search of Carlson's residence and certain records of accounts obtained by the district attorney from two banks after subpoenas duces tecum had been issued and served.

This court issued an order to show cause and stayed the superior court proceedings pending further order of this court. The District Attorney of San Diego County has answered on behalf of the People of the State of California as the real party in interest, and the Attorney General has applied for and received permission to file an amicus curiae brief in support of the People's position. All appearing parties have argued orally.

The motion to suppress evidence was heard and determined on the transcript of the testimony given at the preliminary examination, extensive oral testimony introduced at the superior court hearing and the exhibits which were received in evidence in the proceedings before both the municipal and superior courts. We recite the evidence from these sources insofar as it is pertinent to the issues raised by the writ.

Carlson and Barton owned and operated an insurance business, Carlson & Associates, which was closely associated with Senior Citizens Association of San Diego, an organization headed by Donald Impett. In the spring of 1975, Freda S. Druschel transferred over $70,000 and 83-year-old Lillian M. Voelker transferred over $30,000 to Carlson & Associates.

The People contend the transfers were obtained under false pretenses or by trick and device; Carlson and Barton say the transfers were legitimate business transactions where they were going to obtain life insurance policies for the women for at least the amount transferred and would make them periodic payments. No life insurance policies were obtained.

After Mrs. Voelker talked with Impett and told him Carlson had persuaded her to turn over all her assets in exchange for the insurance policy plus a 10 percent return on her money, Impett called the district attorney's office. Mrs. Druschel's attorney also contacted the district attorney's office about Carlson and Barton. They investigated. Impett told the investigators Carlson and Barton were preparing to leave town.

About 5:30 p.m. on June 12, 1975, Investigator Marquardt went with another investigator and a law student to arrest Carlson and Nancy Bird, his secretary, who lived with him. Bird admitted the men into the apartment. When Marquardt entered, he saw cardboard boxes in the living room and kitchen. He talked with Carlson, arrested him for grand theft, and then, when Carlson agreed, talked with him about Carlson & Associates' dealings with Voelker and Druschel.

Many of the Carlson & Associates' records were in the apartment. Although Carlson consented to a search of the residence, Marquardt secured a telephonic search warrant at 9:20 p.m. Because Carlson wanted to be present during the search, he was placed in the bedroom of the apartment where he stayed for several hours before he was taken to jail and booked.

In the investigation which followed the search of Carlson's apartment, Marquardt obtained two subpoenas duces tecum for records regarding the Carlson & Associates' accounts and transactions at San Diego Trust & Savings Bank and Wells Fargo Bank. An assistant district attorney prepared the declarations using information from an earlier investigation, the search of Carlson's residence, and from Mrs. Druschel's attorney. The subpoenas were issued by an employee of the district attorney's office who is also a sworn deputy clerk of the municipal and superior courts.

The subpoenas ordered, under threat of contempt of court, the custodians of the records to appear as witnesses and "to bring and to

produce" the records in the Presiding Department of the San Diego Municipal Court on July 8, 1975.[1]

After the subpoenas were issued and served, the operations officer of one of the banks discussed the details of the Carlson & Associates account with Marquardt and the deputy district attorney in charge of the case. Following what Marquardt described as "regular practice" both banks, without the knowledge or consent of petitioners, furnished the district attorney's office with xerox copies of their records of the Carlson & Associates accounts before the date the subpoenas required them to be produced in court. Marquardt testified this accorded with the normal practice which he described as follows: "In most cases the operation's officer of the bank after receiving the subpoena, will obtain xerox or photocopies of the bank records and will call me at my office advising when the records are ready to be picked up. . . . These copies will then be picked up and returned to the attorney that has issued the subpoena."

He meticulously explained that, because of *Burrows* v. *Superior Court,* 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590], district attorney investigators no longer talked with bank officials about anyone's bank records or sought to obtain any information from banks *before subpoenas were served.* The original bank records were never produced in court. Copies were introduced at both the preliminary hearing and the hearing on the motion to suppress upon stipulation as to foundation, the defendants reserving all other objections.

In effect, the trial court denied the motion to suppress evidence in its entirety. While it found the telephonic warrant to search Carlson's apartment was overly broad, and did not meet the constitutional standards of specificity, it upheld the search on the ground Carlson had voluntarily consented to it. It found the bank records had been obtained

---

[1]The wording is: "YOU ARE COMMANDED to appear before the Presiding Department of the Municipal Court of California, County of San Diego on the 2nd floor of the Courthouse, 220 West Broadway, San Diego, California, on July 8, 1975 at 8:45 A.M. as a witness in a criminal action prosecuted by the People of California against the above-named defendants.

"YOU ARE FURTHER REQUIRED to bring and to produce, at the above time and place, the above items in your possession or control, as described in the above declaration.

"Disobedience to this subpoena, or refusal to be sworn or to testify as a witness may be punishable as a contempt by the above-entitled court.
"BY ORDER OF THE COURT:

Pursuant to Penal Code section 1331.5, in lieu of such appearance at the time specified above, you may agree with the party at whose request the subpoena was issued to appear at another time or upon such notice as may be agreed upon. . . ."

through "legal process" as required by *Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, 243.

## DISCUSSION

The first issues presented by petitioners relate to the telephonic search warrant. Since the trial court found the warrant invalid, and the People have not sought appellate review of the ruling, the propriety of the holding is not before us.

## I. THE SEARCH OF THE APARTMENT

Petitioners do not contend (nor could they in the light of Carlson's testimony at the superior court hearing) that Carlson did not in fact consent to the search of his apartment. Rather, they maintain the consent was not voluntary. Much of their argument relies upon conflicting evidence and ignores the trial judge's statement that he believed the version of what transpired related by the People's witnesses and disbelieved Carlson and Bird. Viewed in accordance with rules governing appellate review, the evidence shows the consent to search was given before Carlson was handcuffed and before he made a request to call his attorney. It likewise shows the consent to search was given before the telephonic search warrant was discussed or sought. None of these were factors which influenced Carlson's consent.

Neither the fact that Carlson was under arrest at the time of consent to the search, nor the fact he was not advised he had the right to refuse to consent to it, establishes that the consent was involuntary as a matter of law (*People* v. *Smith,* 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Duren,* 9 Cal.3d 218, 241 [107 Cal.Rptr. 157, 507 P.2d 1365]). The officers' entry into the apartment was achieved peaceably. No guns were used, no threats were made, and the incident lacked the display of sudden overwhelming force sometimes evidenced when arrests are made.

Whether a consent to search was freely and voluntarily given, or was instead a submission to express or implied governmental authority is primarily a question of fact to be resolved by reference to all the surrounding circumstances (*Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641]; *People* v. *Strawder,* 34 Cal.App.3d 370, 376 [108 Cal.Rptr. 901]). Here, Carlson consistently maintained that his dealings with Mrs. Druschel and Mrs. Voelker were

legitimate business transactions. He took the position he had nothing to hide. Viewed as a whole, the record supports the trial court's finding expressed in these words: "I believe and I am satisfied beyond a reasonable doubt that the consent was voluntarily given."

## II.   THE BANK RECORDS

In *Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, the California Supreme Court held that a depositor has a reasonable expectation the information and documents he furnishes his bank in connection with his account will remain private, and that disclosure of such information to law enforcement officers without benefit of legal process constitutes an unlawful search and seizure under article I, section 13, of the California Constitution. Even more recently, the Supreme Court of the United States held that a depositor who uses a bank's facilities has no "legitimate expectation of privacy" in the bank records of his account under the Fourth Amendment to the United States Constitution (*United States* v. *Miller*, 425 U.S. 435 [48 L.Ed.2d 71, 96 S.Ct. 1619]). The California Supreme Court in *Burrows* based its decision on the California Constitution (art. I, § 13) and not upon the Fourth Amendment (pp. 245-246). As an intermediate appellate court, we are bound by the *Burrows* holding that a depositor has a reasonable expectation his bank records will remain private and will not be released to law enforcement officials except in response to legal process (*Auto Equity Sales, Inc.* v. *Superior Court*, 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; and see *People* v. *Krivda*, 8 Cal.3d 623, 624 [105 Cal.Rptr. 521, 504 P.2d 457]).

In these proceedings petitioners contend the method used by the district attorney to obtain copies of their records from the banks did not meet the "legal process" requirements of *Burrows* because the prosecutorial agency issued the subpoenas duces tecum to obtain the records on its own authority without any judicial control to verify relevance and other "traditional requirements of legal process." On the other hand, the People maintain the subpoenas duces tecum, issued as provided in Penal Code sections 1326 and 1327 were "legal process" which satisfied the requirements of *Burrows.* Having caused a secretary (also a deputy clerk) to issue the subpoenas duces tecum and an investigator to serve them on the banks, the district attorney argues he had "legal process" in hand which entitled him to see and receive copies of petitioners' bank records.

A subpoena duces tecum, used as provided in the governing statutes, is legal process under which the prosecutor may obtain and use

an accused's bank records in criminal proceedings under appropriate circumstances. ■ The problem presented here is that the statutory requirements were not followed.

The subpoenas duces tecum themselves were in the form prescribed in Penal Code section 1327. They directed the bank officials upon whom they were served to appear before the presiding judge of the municipal court at a certain time on a certain date and required them to bring and produce the items described and listed in the subpoenas duces tecum *at that time and place.* They did not authorize the banks to turn over petitioners' records to the district attorney before the court appearance, or at any time, and they did not authorize the district attorney to receive them.

■ In issuing a subpoena duces tecum, the clerk (or other authorized person—see Pen. Code, § 1326) performs a purely ministerial act,[2] and ". . . the purpose of the subpoena is to initiate proceedings to have the documents and other matters described in the subpoena brought before the court in order that the court may determine whether they are material evidence in the case pending before it." (*Southern Pac. Co.* v. *Superior Court,* 15 Cal.2d 206, 210 [100 P.2d 302, 130 A.L.R. 323].)

The issuance and service of a subpoena duces tecum merely requires the person upon whom it is served to appear in court with the records, books or documents described in the subpoena. It is not legal process in the sense it entitles the person on whose behalf it was issued to obtain access to the records described in it until there has been a judicial determination that person is legally entitled to view or receive them.

What was said by the Supreme Court in *Southern Pac. Co.* v. *Superior Court, supra,* 15 Cal.2d 206, 210, although in the context of civil litigation is pertinent here:[3] "It cannot be said that the issuance of a *subpoena duces tecum* requiring the production of private papers or documents in the manner provided by sections 1985 and 1986 of the Code of Civil

---

[2]Since issuance of the subpoenas duces tecum was a ministerial act, petitioners' claim of prejudice because the subpoenas duces tecum here were issued by an employee of the district attorney's office who was also a deputy clerk has no merit. Penal Code section 1326 authorizes a magistrate, his clerk, the district attorney, his investigator, the public defender, his investigator, and the clerk or judge of any court in which a criminal action is to be tried to issue subpoenas duces tecum.

[3]The Code of Civil Procedure provision governing subpoenas and subpoenas duces tecum (Code Civ. Proc., § 1985 et seq.), particularly as they pertain to the production of documents in court, are substantially the same as those contained in the Penal Code.

Procedure is violative of article I, section 19, of the Constitution of this state [now art. I, § 13], which seeks to protect the citizen against unreasonable searches and seizures. Before any such paper, document, book, or other thing is required to be produced in court, the party against whom it is sought to be used has the right to a judicial determination by the judge before whom the action is pending as to whether the matter sought to be produced is material to the pending case, and also whether its production in court will violate his constitutional rights against unlawful search and seizure."

Running through the People's argument urging us to approve the procedure followed here is the idea a subpoena duces tecum may be properly used as a tool for discovery in criminal proceedings and that the prosecution is entitled to unsupervised access to records described in a subpoena in advance of court proceedings so that it may adequately prepare and present its case. These contentions ignore the plain language of the statutory requirements as well as the constitutional guarantees those requirements are designed to protect. Surely an accused's constitutional right to privacy in his papers and records is not diminished because law enforcement officials seek to obtain them by subpoena rather than by warrant. ■ It follows that law enforcement officials may not gain access to an accused's private papers by subpoena until there has been a judicial determination there is probable cause to believe he has committed a criminal offense and that the papers and documents described in the subpoena would be material evidence in the case. Such determinations are not and cannot be made by the clerk who issues the subpoena and may not be made by the prosecutor himself.

As stated in *Valley Bank of Nevada* v. *Superior Court*, 15 Cal.3d 652, at page 656 [125 Cal.Rptr. 553, 542 P.2d 977]: "A constitutional amendment adopted in 1974 elevated the right of privacy to an 'inalienable right' expressly protected by force of constitutional mandate. (Cal. Const., art. I, § 1.)" We are aware that the extension of the right of privacy to include financial information a depositor discloses to his bank delineated in *Burrows* may disrupt the procedures which were used by law enforcement officials to obtain bank records before the right was declared. Perhaps legislative clarification may be required (see e.g. Fed. Rules of Crim. Proc., rule 17, subd. (c)). In any event, in whatever context those rights arise, trial courts must devise appropriate procedures to protect them.

■ Here, petitioners' bank records were not produced in court as required by the subpoenas. They were voluntarily turned over to the

district attorney by the banks involved without a judicial determination the district attorney was legally entitled to them. Thus they were acquired without legal process and as a result of illegal search and seizure (*Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, 245). The motion to suppress evidence should have been granted as to the records of petitioners' accounts obtained by the district attorney directly from the banks.

Let a writ of mandate issue directing the trial court to suppress the evidence obtained from the banks in violation of the views expressed in this opinion.

Brown (Gerald), P. J., and Cologne, J., concurred.

Petitions for a rehearing were denied May 17 and 20, 1976, and the petition of the real party in interest and the application of petitioners for a hearing by the Supreme Court were denied July 1, 1976.